IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-00042-PAB

In re: ms55, Inc. f/k/a MSHOW.COM, INC., Debtor

JEFFREY HILL, Trustee,

    Plaintiff-Appellant,
v.

GIBSON, DUNN & CRUTCHER LLP,

    Defendant-Appellee.

---

**ORDER**

---

This matter comes before the Court on the appeal of orders of the Bankruptcy Court denying the motion to amend findings and judgment filed by plaintiff-appellant Jeffrey Hill, Trustee ("the Trustee"). The Court exercises jurisdiction pursuant to 28 U.S.C. § 158(a)(1). For the following reasons, the Court affirms the Bankruptcy Court.

**I. BACKGROUND**

This appeal is the second to reach this Court arising out of this Bankruptcy Court Adversary Proceeding. The Trustee, a Chapter 7 trustee for the bankruptcy estate of Debtor MSHOW.com ("MSHOW"), originally "alleg[ed] tort violations by [appellee Gibson Dunn & Crutcher, LLP ("Gibson Dunn")], a law firm that served as outside counsel to Debtor in connection with several pre-petition and ostensibly some post-petition financial transactions . . . ." *In re Ms55, Inc.*, No. 06-cv-01233-EWN, 2007 WL 2669150, at *1 (D. Colo. Sep. 6, 2007). The Bankruptcy Court granted summary judgment to Gibson Dunn based upon a finding that the Trustee stood *in pari delicto*

with Gibson Dunn and, therefore, had no standing to pursue his claims. This Court reversed that decision as to the Trustee's claims of aiding and abetting and civil conspiracy to commit a breach of fiduciary duty.

On remand, the Bankruptcy Court held a trial on those two claims in September 2009. On December 4, 2009, the Bankruptcy Court issued its Findings of Fact, Conclusions of Law, and Ruling. *In re ms55, Inc.*, 420 B.R. 806 (Bankr. D. Colo. 2009). As Gibson Dunn points out, the Bankruptcy "Court made detailed findings of fact that the Trustee does not challenge." Docket No. 18 at 12. Therefore, the Court incorporates the following relevant background factual findings of the Bankruptcy Court. *See In re Ms55, Inc.*, 2007 WL 2669150, at *1 (relying upon and excerpting the uncontested factual findings of the Bankruptcy Court) (citing *In re Winslow*, 186 B.R. 716, 721 (D. Colo. 1995)).

> MSHOW was a technology company of the late 1990's that specialized in development of synchronized audio and video communication over the internet and telephone. While this enterprise never achieved profitable operations, it was of substance before its decline in 2000 and 2001, and ultimate unsuccessful attempt to reorganize in Chapter 11. From private investors it had raised in excess of $67 million. Its founders had previously developed and sold a technology company for $24 million. It had an active, sophisticated board. It engaged high profile, well-regarded legal counsel and investment bankers. Its business operations were global in scope. It employed approximately 250 people in offices in five states and Great Britain. Among its customers were some of the world's largest telecommunications and investment banking businesses.
>
> By late 2000, MSHOW began to feel the adverse consequences of what was commonly referred to as the "bursting of the dot-com bubble," MSHOW's business model was in trouble. . . . MSHOW suddenly confronted a shortage of cash and a need to downsize. In December 2000, management laid off approximately fifty people. Also in December 2000, MSHOW entered into a joint undertaking with a foreign competitor, Akamai Technologies, Inc. ("Akamai"). This arrangement, in addition to providing perceived operating advantages to MSHOW, contemplated further investment by Akamai in

MSHOW. The Akamai transaction required MSHOW to pay $3,150,000 by January 15, 2001, for a customer list and license fee.  In deferring this payment, Akamai was unwilling to rely on the strength of MSHOW's credit.  It looked to and received credit support from MSHOW's two largest equity investors, Howard H. Leach and his living trust (collectively "Leach") and the Blue Chip Capital Fund III, Limited Partnership ("Blue Chip").  At the time both Leach and Blue Chip also were represented on MSHOW's board.  Leach was a longstanding client of [Gibson Dunn], who had introduced MSHOW to [Gibson Dunn].

The credit support from Leach and Blue Chip of MSHOW's deferred payment obligation to Akamai came in two different formats.  Leach simply guaranteed one-half of the obligation, to wit, $1,575,000. Leach's guaranty was backed by a letter of credit of like amount that he caused to be issued by his bank in favor of Akamai.  MSHOW, in turn, promised to pay Leach $1,575,000 if this letter of credit was drawn on by Akamai or if Leach otherwise paid on his guaranty in favor of Akamai.  This contingent reimbursement obligation of MSHOW to Leach was secured by MSHOW in favor of Leach in December 2000, by the grant and perfection of a security interest in MSHOW's intellectual property.

Blue Chip provided credit support for the other half ($1,575,000) of MSHOW's deferred payment obligation to Akamai without giving Akamai a guaranty.  Blue Chip was prohibited by its own governing documents from guarantying obligations of the portfolio companies, like MSHOW, in which it had invested.  Instead of a guaranty in Akamai's favor, Blue Chip agreed with Akamai to invest in MSHOW in the form of subordinated debt or equity an additional $1,575,000, which in turn, would assure MSHOW's ability to pay one-half of the deferred MSHOW obligation to Akamai.  On January 12, 2001 Blue Chip moved $1,575,000 to an MSHOW restricted bank account.  With these funds MSHOW was able to obtain a letter of credit from its bank in favor of Akamai.  If and when this letter of credit was drawn by Akamai, MSHOW's issuer bank would pay itself from the MSHOW $1,575,000 restricted account. MSHOW in turn would owe Blue Chip $1,575,000 plus interest if Blue Chip elected to take its additional investment in MSHOW in the form of debt.  This $1,575,000 contingent obligation of MSHOW to Blue Chip, first incurred by MSHOW in December 2000, was from its inception an unsecured obligation of MSHOW.

With Leach's and Blue Chip's credit support, Akamai agreed to extend the date by which MSHOW was to pay Akamai $3,150,000.  MSHOW's management continued what was becoming a desperate effort to find new capital or a business interested in acquiring MSHOW.  In late January 2001, MSHOW received both promising and discouraging news.  Its investment bankers, Morgan Stanley Dean Witter, reported to the board that its efforts

to raise capital or find a strategic partner for MSHOW had failed after approaching more than one hundred strategic, private equity, and venture capital investor candidates. At about the same time MSHOW received a non-binding letter of intent and term sheet from Quest Digital Media ("QDM") proposing acquisition by QDM of MSHOW's assets in exchange for an equity position in QDM. This proposal would have fully provided for MSHOW's creditors and provided a chance for MSHOW's equity investors to recover at least a substantial portion of their investments. MSHOW's CEO, Robert Ogdon, testified that on consulting with MSHOW's investment bankers, QDM's proposal was valued in the $50 million range.

Faced with mounting pressure of a cash shortage, MSHOW's executive management consulted with [Gibson Dunn] for general legal advice concerning the scope of fiduciary duties of officers and directors once a corporation approached or reached insolvency. On or about January 23, 2001, [Gibson Dunn] addressed a memo to MSHOW's CEO and CFO explaining that under Delaware corporate law, as a company became insolvent the fiduciary duties of directors and officers expanded to run to creditors in addition to the corporation and its shareholders.

Unable to locate other sources to meet its immediate cash needs, MSHOW's management again turned to its largest investors. Once again, Blue Chip and Leach took the lead. In February 2001, Blue Chip and Leach agreed to a short term, secured loan facility with MSHOW under which each advanced $125,000 for thirty days. These advances were secured by MSHOW's principal assets with a security interest that was junior to the security interest in favor of Leach that had been granted the previous December.

At this same time MSHOW's management, Leach, and Blue Chip approached a larger group of the company's existing major investors and Akamai with a proposal for a larger secured "bridge loan" for purposes of (a) refinancing MSHOWs $3,150,000 payment obligation to Akamai, which was soon to be owing by MSHOW to Leach and Blue Chip as a result of their credit support of the MSHOW/Akamai transaction; (b) refinancing Leach's and Blue Chip's thirty-day advances of $125,000 each to MSHOW from February 2001; and (c) bridging MSHOW's immediate cash needs while it either closed the QDM proposal or found an alternative investor, acquirer, or partner.

As this "bridge loan" proposal was being formulated and presented to the potential insider lending group, [Gibson Dunn] and MSHOW's management turned specifically to the question of whether, if, as part of the proposed secured bridge loan, MSHOW's contingent unsecured $1,575,000 obligation to Blue Chip was refinanced, might this part of the transaction be avoided as a preference or fraudulent transfer in the event MSHOW filed bankruptcy?

> On February 5, 2001, Blue Chip was advised of this inquiry by MSHOW's CFO, Roger Moody. [Gibson Dunn] concluded that, if bankruptcy ensued, the conversion of this portion of MSHOW's obligations to Blue Chip from unsecured to secured, "would likely be a preferential transfer," and that "there are serious fraudulent transfer issues." This conclusion, according to the testimony of Leach and MSHOW's CEO, Robert Ogdon, was shared with the board and the other prospective bridge lenders, without objection. According to Leach, the elevation of Blue Chip's prior unsecured position as part of the bridge loan simply reflected the insiders "pulling the same wagon" in hopes of rescuing MSHOW's substantial value as a going concern for the benefit of creditors and shareholders alike. To this end, in connection with the bridge loans, Leach and Blue Chip subordinated their existing security interests – Leach with respect to MSHOW's $1,575,000 December 2000 contingent reimbursement obligation and his February 2001 $125,000 advance; and Blue Chip with respect to its February 2001 $125,000 advance to MSHOW.
>
> Shortly before closing on the $125,000 February secured advances by Leach and Blue Chip to MSHOW, the nonbinding QDM letter of intent, which had contemplated acquisition of MSHOW, was withdrawn. With receipt of that news on or about February 20, 2001, MSHOW's management stepped up its cash conservation and downsizing efforts still seeking to maintain MSHOW's value as a going concern. . . .
>
> On or about March 21, 2001, the bridge loan closed. [Gibson Dunn] represented MSHOW in this transaction and prepared the closing documents. The terms of the loan were dictated by MSHOW's executive officers, the participating insider lenders and Akamai, the only non-insider lender. . . .  The total advanced on the bridge loans was $7,037,740. Of that amount, $3,637,740 was new cash to MSHOW and $3,400,000 refinanced MSHOW's December 2000 and February 2001 obligations to Leach and Blue Chip. The entire bridge loan was secured by substantially all MSHOW's assets. Of the $3,400,000 Leach/Blue Chip debt that was refinanced, $1,575,000 had been unsecured.

*In re ms55, Inc.*, 420 B.R. at 810-13.

The Trustee argued before the Bankruptcy Court that Gibson Dunn "aided and abetted and conspired with directors and officers of MSHOW in breaching their fiduciary duties to general creditors of MSHOW." *Id.* at 810.  "The alleged breach of fiduciary duty at issue was officers and directors causing MSHOW to make a fraudulent and/or

5

preferential transfer in favor of one of their own at a time when MSHOW was insolvent." *Id.* The Bankruptcy Court concluded that Delaware law applied to the Trustee's claims, *see id.* at 819-22, and that, pursuant to Delaware law, "there is no direct duty owed by directors to creditors." *See id.* at 822 ("[B]ecause the Trustee's remaining claims in this proceeding are not derivative claims, the Court concludes that the directors and officers of MSHOW did not breach any fiduciary duty to creditors.").[1]

## II. DISCUSSION

Appellant's first argument on appeal is that the Bankruptcy Court erred by applying Delaware law instead of Colorado law to appellant's claims of aiding and abetting and conspiring to commit a breach of fiduciary duty. The material facts related to that decision are not in dispute.[2] Rather, appellant challenges the Bankruptcy Court's interpretation of controlling law and its application of facts to that law. The Court reviews the Bankruptcy Court's legal determinations de novo. *See In re Baldwin*, 593 F.3d 1155, 1159 (10th Cir. 2010). The Court also reviews de novo mixed questions of law and fact that primarily involve legal issues. *See In re Wes Dor Inc.*, 996 F.2d 237 (10th Cir. 1993).

The Bankruptcy Court, in reaching its decision to apply Delaware law to the issue of what duties, if any, the officers and directors of MSHOW owed to creditors, relied

---

[1] The Bankruptcy Court proceeded to apply Colorado law in the alternative. For reasons that will become clear below, the Court need not discuss the application of Colorado law.

[2] When factual determinations are challenged, district courts review the Bankruptcy Court's factual findings pursuant to a clearly erroneous standard of review. *See In re Baldwin*, 593 F.3d 1155, 1159 (10th Cir. 2010).

upon *Ficor, Inc. v. McHugh*, 639 P.2d 385 (Colo. 1982).[3] In *Ficor*, the Colorado Supreme Court addressed the issue of whether the law of the place of incorporation (District of Columbia) or the forum state (Colorado) should apply to claims regarding the "rights and duties between the corporation's directors and shareholders and the corporation's creditors, incident to [the corporation's] dissolution." 639 P.2d at 391. The *Ficor* court first noted that "the method of effecting" the corporation's dissolution was governed by the law of the District of Columbia because it was the place of incorporation. *See id.* (citing Restatement (Second) of Conflict of Laws ("Restatement") § 299). Determining the law "governing the relevant rights and obligations between corporate creditors on the one hand, and officers, directors, and shareholders of the corporation on the other," however, was "less readily determinable." *Id.* As the Bankruptcy Court pointed out, the "Colorado Supreme Court has utilized the 'internal affairs doctrine,' as set forth in [Restatement] § 309," upon which the *Ficor* court relied, to resolve such issues. *See In re ms55, Inc.*, 420 B.R. at 820. Pursuant to Restatement § 309, the

> local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.

---

[3] Neither party challenges the application of Colorado choice of law rules to the question presented by this appeal.

7

Restatement § 309.[4]  The *Ficor* court concluded that the exception described in § 309 had been met where, "[e]xcept for its incorporation in the District of Columbia and the fact that some of its officers, directors, and shareholders reside in or near the District of Columbia, *all* of Ficor's activities were conducted in Colorado and *all* of its assets were located here."  *Ficor*, 639 P.2d at 391 (emphases added).  Moreover, the *Ficor* court concluded that application of Colorado law would not alter the result in any event, because the two sovereigns' laws were so similar at the time.  *See id.*

The Bankruptcy Court applied § 309 and *Ficor* to the facts of this case and found that the law of Delaware, where MSHOW was incorporated, applied to the issue of what duties the directors owed to creditors.  The Bankruptcy Court based that ruling on the following undisputed facts:

> In contrast to the corporation in *Ficor*, MSHOW engaged in legitimate and substantial business operations throughout the United States and worldwide. Though its corporate headquarters were located in Colorado, it had four other offices in the U.S. – in Washington, Illinois, Texas and California – and one in the United Kingdom.  Its customers included Singapore Telecom and telecommunications companies in France and Italy.  Its directors were from

---

[4]The Section 6 considerations are as follows:
(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
    (a) the needs of the interstate and international systems,
    (b) the relevant policies of the forum,
    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
    (d) the protection of justified expectations,
    (e) the basic policies underlying the particular field of law,
    (f) certainty, predictability and uniformity of result, and
    (g) ease in the determination and application of the law to be applied.
Restatement § 6.

> various states. The claims register in MSHOW's Chapter 11 case reveal
> creditors from 24 different states, the United Kingdom, and Canada.

*In re Ms 55, Inc.*, 420 B.R. at 821. The Trustee contends that it was legal error to apply Delaware law to the issue of the directors' duties to creditors.

As an initial matter, the Court agrees with the Bankruptcy Court that the Trustee's claims arising out of a director's alleged breach of his fiduciary duties to creditors are subject to the "internal affairs doctrine." Restatement § 309 makes clear that the relevant duties are not limited to those owed "to the corporation . . . and [its] shareholders," but also extends to duties owed to "its creditors." Furthermore, "[s]tates normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care." *Atherton v. FDIC*, 519 U.S. 213, 224 (1997); *see LaSala v. Bordier et Cie*, 519 F.3d 121, 131 n.13 (3d Cir. 2008) ("The parties agree that Delaware law applies to the breach-of-fiduciary-duty counts. This is clearly correct, as the claims involve the corporation's internal affairs, and the state of incorporation is Delaware."); *Weiss v. Kay Jewelry Stores, Inc.*, 470 F.2d 1259, 1268 (D.C. Cir. 1972) ("Kay, being a Delaware corporation, the fiduciary obligations of its officers and directors are to be determined upon the ascertainment and proper application of the law of Delaware."); *see also Mukamal v. Bakes*, 378 F. App'x 890, 896 (11th Cir. 2010) ("The fiduciary duties owed to a corporation by its officers and directors concern the internal affairs of a corporation."); *Wilshire Oil Co. of Tex. v. Riffe*, 409 F.2d 1277, 1283 (10th Cir. 1969) ("The liability asserted against Masterson as an employee of a foreign corporation is based upon the theory that his unauthorized violation of the antitrust laws constitutes a violation of the fiduciary duty owed to the

corporation. As such, this is a claim involving the internal affairs of a foreign corporation and clearly justifies the utilization of the concomitant choice-of-law rule.").[5]

The next issue is whether the Bankruptcy Court correctly applied the § 309 analysis to the facts of this case. The Trustee claims it did not, arguing that the decision to apply Colorado law in *Ficor* was primarily based upon the relative lack of connection to the District of Columbia and that, here too, MSHOW has no connection to Delaware other than being incorporated there. While the Trustee is correct that a lack of connection to the state of incorporation is a factor to be considered, *see* Restatement § 302, comment g ("The reasons for applying the local law of the state of incorporation carry less weight when the corporation has little or no contact with this state other than

---

[5] *Cf. MHC Investment Co. v. Racom Corp.*, 254 F. Supp. 2d 1090, 1097-98 (S.D. Iowa 2002):
> For the types of breach of fiduciary duty claims raised in this case, the Court finds it must follow the "internal affairs doctrine," which is "a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs – matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders – because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). The Restatement (Second) of Conflicts of Law advises that "[s]tates normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care." *Id.* (citing Restatement (Second) Conflict of Laws § 309 (1971)). Parties often freely choose the state of incorporation and that state's laws already necessarily govern at least some of the internal affairs of the corporation, as they do in two lawsuits in this case. Consequently, the Court finds that, in light of the internal affairs doctrine, the laws of the state of incorporation should apply in breach of fiduciary duty cases against directors and officers.

10

the fact that it was incorporated there."),[6] he overstates its significance. The Restatement § 302, comment g, advises that:

> In such situations, some other state will almost surely have a greater interest than the state of incorporation in the determination of the particular issue. Nevertheless, *in the absence of an explicitly applicable local statute, the local law of the state of incorporation has almost invariably been applied*. This result furthers the choice-of-law factors of certainty, predictability and uniformity of result, ease in the application of the law to be applied and, at least on occasion, protection of the justified expectations of the parties.

The Trustee does not identify any "explicitly applicable local statute" that would suggest Colorado law should apply. Moreover, the Trustee's reading of *Ficor* significantly downplays the predominant connection found to exist between the corporation in that case and the state of Colorado. Indeed, as noted above, the *Ficor* court stated that *all* of the business activity and assets were in Colorado.

Here, as the Bankruptcy Court found, MSHOW had a presence in many states and countries. In the absence of any compelling countervailing interest, "certainty, predictability and uniformity of result, ease in the application of the law to be applied and, at least on occasion, protection of the justified expectations of the parties" results from applying the law of the state of incorporation. *See In re Chalk Line Mfg., Inc.*, 1994 WL 394978, at *5 (Bankr. N.D. Ala. July 26,1994) ("Although the Restatement would under some circumstances allow a court to apply the law of a state other than the state of incorporation, the comments suggest that this exception to the general rule is narrowly drawn and would not apply to a corporation doing business in many states and abroad."). The Trustee has failed to identify any countervailing Colorado interest that

---

[6] *See* Restatement § 309, comment c. ("What is said in Comments e-g of § 302 is applicable here.").

would overcome the § 309 presumption. While the Trustee is correct that MSHOW might have had a greater connection to Colorado than any other state or country where it conducted business, he does not identify how those particular connections are of specific relevance "with respect to the particular issue," Restatement § 309, presented by appellant's claims.

Having failed to identify any connection to or specific interest of Colorado that overcomes the § 309 presumption, the Trustee attempts to identify a broad state interest in protecting creditors. See Docket No. 17 at 15. He avoids any discussion, however, of Colo. Rev. Stat. § 7-115-105(3), which was enacted after *Ficor* and was in effect at all times relevant to appellant's claim.[7] Section 7-115-105(3) provided that Colorado laws governing corporations "[do] not authorize this state to regulate the organization or internal affairs of a foreign corporation." This provision not only undermines his argument regarding the interests of Colorado, but is also arguably a relevant "statutory directive . . . on choice of law." Restatement § 6. Indeed, it would appear to eliminate the discretion to apply Colorado law in cases, such as this, where the internal affairs of a corporation are at issue. See *In re ms55, Inc.*, 420 B.R. at 822 (noting that § 7-115-105(3) "was conceivably intended to overrule *Ficor*'s application of Colorado statutes to the internal affairs of a foreign corporation"). In sum, the Court concludes that, for the reasons discussed above, the Bankruptcy Court correctly

---

[7] This statutory provision has since been repealed and replaced with Colo. Rev. Stat. § 7-90-805(4) ("As to any foreign entity transacting business or conducting activities in this state, the law of the jurisdiction under the law of which the foreign entity is formed shall govern the organization and internal affairs of the foreign entity and the liability of its owners and managers.").

applied the § 309 analysis and that any effect of § 7-115-105(3) on the continued viability of that analysis would only further support the application of Delaware law in this case.

Furthermore, the Trustee is incorrect that the "few authorities [since *Ficor*] indicate . . . that Colorado would in many situations be inclined to apply its own law instead of the state of incorporation." Docket No. 17 at 16 (citing *Jefferson Indus. Bank v. First Golden Bancorp*, 762 P.2d 768 (Colo. App. 1988); *Levine v. Katz*, 192 P.3d 1008, 1011-12 (Colo. App. 2006)). The court in *Jefferson* addressed the distinguishable issue of state laws regarding the rights of shareholders to inspect corporate books. As the *Jefferson* court found, in regard to that specific issue, comment d. to Restatement § 304 states that "a court will apply to a foreign corporation doing substantial business in the state a local statute providing for the inspection of books by a shareholder if in the court's opinion the statute embodies an important policy." *See id.* ("The right of a shareholder to inspect the books of a corporation . . . is an issue which can practically be determined differently in different states."). And while the Trustee points out that, "[in] *Levine v. Katz*, 192 P.3d 1008, 1011-12 (Colo. App. 2006), the court held that the internal affairs of trusts did not include malpractice claims against the trust's lawyer," Docket No. 17 at 16, he does not explain how that conclusion is applicable to the present matter.

The Trustee contends that "[n]umerous jurisdictions outside of Delaware have recognized the internal affairs doctrine does not apply to non-derivative claims of creditors and other third party claims." Docket No. 17 at 16. As for "other third-party

claims," the Trustee does not contend that such are his claims in this case. Regarding whether "non-derivative claims of creditors" are subject to the internal affairs doctrine, the Trustee does not identify the specific type of claims at issue in the cases he cites. As Gibson Dunn points out in response, fiduciary duty claims have generally been deemed to fall within the "internal affairs doctrine." *See supra*. The Trustee cites no persuasive authority to the contrary.[8]

In sum, the Court concludes that the Bankruptcy Court correctly decided to apply Delaware law. The Trustee provides no reason to question the Bankruptcy Court's conclusion that, pursuant to Delaware law, directors owe creditors no direct fiduciary duties. *See North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 101-03 (Del. 2007). The Court finds, therefore, that the claims for aiding and abetting and civil conspiracy to commit a breach of fiduciary duty fail. *See Nelson v. Elway*, 971 P.2d 245, 249-50 (Colo. App. 1998) (stating that the

---

[8]The Trustee challenges the Bankruptcy Court's conclusion that "justified expectations" support the application of Delaware law, relying upon *RTC v. Everhart*, 37 F.3d 151, 154 (4th Cir. 1994). The Trustee cites the following passage from *RTC* where the Court quotes a dissenting opinion from a Seventh Circuit case: "'[T]he policy animating the presumption in favor of applying the law of the state of incorporation, the policy of shielding directors and officers from conflicting legal obligations, is not engaged by the facts of this case, as there is no suggestion that these directors (of a bank and receivership) have been or will be sued under the law of another state.'" *RTC*, 37 F.3d at 154 (quoting *RTC v. Chapman*, 29 F.3d 1120 (7th Cir. 1994) (Posner, J., dissenting)). As an initial matter, this passage is not specifically addressing the "justified expectations" factor.

The *RTC* case addressed the distinguishable issue of whether to apply federal law to a federally chartered company or the law of a single state in which it had long been incorporated prior to becoming federally chartered. In regard to the "justified expectations" factor and unlike the quoted language from *RTC*, the record here does not support the conclusion that "[e]veryone connected with [MSHOW] would have thought [Colorado] law applicable to a dispute of this character." *RTC*, 37 F.3d at 154 (quotation marks and citation omitted).

"elements of the tort of aiding and abetting a breach of fiduciary duty include . . . [a] breach by a fiduciary of a duty owed to a plaintiff" and that one element of a civil conspiracy claim is "an *unlawful* overt act") (emphasis added). That being the case, the Court will not reach the Trustee's remaining challenges which all rely on the application of Colorado law.[9]

### III. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Bankruptcy Court's decision is AFFIRMED and this matter is closed.

DATED March 21, 2011.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

---

[9]The Trustee argues that the Bankruptcy Court erred by "determining no fiduciary duty was owed under Colorado law by the debtor's directors for a preference to Blue Chip while insolvent", by "failing to find the debtor was insolvent when it preferred Blue Chip," and by "failing to find [Gibson Dunn] was a civil co-conspirator with the debtor's director's to unlawfully prefer Blue Chip." Docket No. 17 at 6.